PHOENIX ASSURANCE COMPANY, LTD. v. LOETSCHER.

4-8779                                    219 S. W. 2d 629

Opinion delivered April 4, 1949.

Rehearing denied May 9, 1949.

*John M. Lofton, Jr.,* and *Owens, Ehrman & Mc-Haney,* for appellant.

*T. J. Gentry* and *D. D. Panich,* for appellee.

MINOR W. MILLWEE, Justice. In June, 1946, appellees, Raymond P. Loetscher and Charles H. Loetscher started construction of a building on the Base Line Road in a rural community west of the City of Little Rock. They planned to use the building in the operation of a garage for the repair of motor vehicles. In order to secure a loan from the Reconstruction Finance Corporation to complete construction of the building, appellees were required to procure insurance against the perils of fire, tornado and lightning. On January 22, 1947, appellant, Phoenix Assurance Company, Ltd., issued its policy to appellees against these perils in the principal sum of $12,000. The building was nearing completion when it collapsed or was destroyed during a rain and thunder storm about 4:30 or 5:00 a. m., October 18, 1947.

Appellees' claim for loss of the building by lightning was denied and they filed this suit on December 5, 1947, alleging issuance of the policy, payment of the premium of $118.20 and total destruction of the building by lightning on October 18, 1947. It was further alleged that the building was of the value of approximately $20,000 at the time of its destruction and judgment was prayed for $12,000, plus the statutory penalty of 12% and attorney's fee.

On December 24, 1947, appellant answered admitting the issuance of the policy and that it was in force as alleged in the complaint, but denied all other allegations therein. On February 18, 1948, appellant filed an amendment to its answer pleading that the policy contained a "Full Completed Value Contribution Clause" which provided that the company was liable for no greater proportion of the loss than the amount of insurance bore to 100% of the actual value of the building when fully completed and ready for occupancy.

A second amendment to the answer was filed April 12, 1948, specifically denying that the building had been totally destroyed and alleging that if appellee should recover any amount, it should be limited to 12/20 of the amount of damage to the building as it existed on the date of its destruction. On April 19, 1948, appellant withdrew its first amendment to the answer.

The issues were tried before a jury resulting in a verdict for appellees for $12,000 for which judgment was rendered together with 12% penalty and attorney's fee of $1,800.

The building in question was 125 feet long and 60 feet wide with walls of concrete blocks and brick and a metal roof supported by steel trusses 60 feet in length and extending crosswise from wall to wall. Construction of the building was under the supervision of Henry Buddenburg, appellees' uncle, who was an experienced builder, but not an architect or engineer.

Appellees presented one witness who testified that he saw lightning strike and demolish the building during the storm on the morning in question. Other witnesses who lived nearby heard a violent clap of thunder and the noise of the falling building. Much of the testimony offered by appellant was directed to the type of materials and construction used and several experts gave it as their opinion that the building collapsed because of faulty materials and improper construction. Thus a disputed question of fact was presented to the jury as to the cause of the destruction of the building and the issue was resolved in favor of appellees.

Appellant first contends that the evidence is insufficient to support a finding by the jury that the building was totally destroyed and that the trial court, therefore, erred in submitting this issue to the jury. Appellant says: "It is our contention here that the uncontradicted and only testimony clearly proved that certain portions of the building remained which could be used for the reconstruction of the building, and that there was, therefore, not a total loss. Under these conditions the court should have instructed the jury that appellees could not

recover the full amount of their policy of insurance and should have instructed them to determine the value of those portions of the building remaining and make the appropriate calculation under the provisions of the policy or permit the court to make the calculations after determining the extent of the loss.''

The court gave Instructions 1 and 2 requested by appellees as follows: ''Instruction No. 1—You are instructed that the burden of proving that said building being constructed by the plaintiffs and insured by the defendant was struck by lightning and as a result thereof was totally demolished is upon the plaintiffs, and if you find from a preponderance of the evidence in this case that the building was struck by lightning, and it was so far destroyed that no substantial portion remains in place capable of being utilized to advantage in restoring the building in the condition in which it was before being struck by lightning, then the building is a total loss. Whether or not the remnant of the building, if any remains, is adapted to use to restore the building to its condition before being struck by lightning depends on whether a reasonably prudent owner, uninsured, desiring to construct such a building as the building was before being struck by lightning, in proceeding to restore the building to its original condition, would utilize the remnant.

''Instruction No. 2—You are instructed that the terms of the insurance policy issued to plaintiffs by the defendant covers the construction of the building described in said policy of insurance, and until fully completed or occupied in whole or in part, said policy of insurance was in full force and effect. If you find from a preponderance of the evidence in this case that said building was demolished as a direct result of being struck by lightning prior to its completion or occupancy in whole or in part, your verdict will be for the plaintiffs.''

Appellant objected generally to the giving of Instruction No. 1 and specifically to Instruction No. 2 on the ground that it afforded no basis upon which to fix the amount of a verdict for partial destruction of the building. While appellant did not request an instruction

confining the jury's consideration to partial destruction of the building, the court gave appellant's requested Instruction A, as follows: "If you should find that the plaintiff is entitled to recover in this cause and in addition you should further find that the building was not a total loss, but that there was some value remaining, you will answer the following interrogatories: 1. What is the actual completed value of the building? 2. What is the value of the salvage, if any, that you find remains after the destruction of the building?

The three instructions, when considered together, correctly stated the applicable law as declared by this court in *St. Paul Fire & Marine Ins. Co.* v. *Green*, 181 Ark. 1096, 29 S. W. 2d 304, and *The Home Insurance Co. of N. Y.* v. *Cole*, 195 Ark. 1002, 115 S. W. 267. However, appellant urges that the uncontradicted proof showed a remnant of the structure remaining which was reasonably adaptable to use in restoring the building to its former condition.

The policy did not cover the cost of concrete foundations or supports which are below the surface of the ground in a building constructed without a basement. There was no basement in the building erected by appellees. Testimony on behalf of appellees was that portions of the walls standing after collapse of the building were cracked and would have to be removed and rebuilt; that it would cost more to remove and clean the concrete blocks and brick than it would to purchase new materials; and that there was nothing in the remnants of the wrecked building from the foundation up that a prudent builder would use in restoring the structure.

There was a concrete floor or fill four inches thick laid over gravel estimated by a witness for appellant to have cost $1,750. Appellant earnestly contends that this was a finished floor which was covered by the policy and adaptable for use in restoring the building. Witnesses for appellees referred to this part of the structure as a concrete fill, or foundation, for the floor. Henry Buddenberg, the contractor, testified that this fill lacked four inches reaching the level of the highway or lot surface and that it was their plan to add four inches of

concrete to the fill and put a thinner on top to bring it up to the level of the highway. Appellees gave similar testimony. The cost of this part of the structure was not included in the itemized statement introduced by appellees showing a total of $16,942.46 in the costs of labor and materials used in the construction of the building at the time of its collapse. We think this evidence, considered in the light most favorable to appellees, was sufficient to support a finding that this part of the structure constituted a part of the foundation for a floor which was below the surface of the lot. Hence, it was not covered by the terms of the policy and any ambiguity in the exclusion clause is to be construed strictly against the insurer and liberally in favor of the insured under our well established rule of interpretation of insurance contracts. While the evidence on the whole was conflicting as to whether or not the remnants covered by the policy were capable of being utilized to advantage in restoring the building to its former condition, it was sufficient to support the verdict for total loss of the building.

Since the jury found there was a total loss, it is unnecessary to consider the contribution clause relied on by appellant. Under our Valued Policy Statute (§ 7720, Pope's Digest) an insurance company is liable, in case of total loss, for the full amount stated in the policy, or the full amount upon which it collects a premium. *St. Paul Fire & Marine Ins. Co.* v. *Green, supra; Firemen's Insurance Company* v. *Little,* 189 Ark. 640, 74 S. W. 2d 777, and cases there cited.

A second ground for reversal relied on by appellant, and strongly urged in the oral argument, is that the court erred in refusing to declare a mistrial when it was discovered that Paul Lyons, one of the jurors, was disqualified and incompetent to serve on the jury. It is contended that the juror deliberately and intentionally failed to disclose his knowledge of the facts of the case upon his *voir dire* examination and that appellant was thereby prevented from exercising his right of peremptorily challenging said juror.

During the course of the trial, and before appellees had completed their testimony in chief, the jury was directed to view the wrecked building at the request of appellant. After the usual instructions had been given, the juror, Paul Lyons, asked the court, ''Do you have to go out there, if you have already seen it?'' The juror was then thoroughly examined by counsel for both parties and stated that he had seen the collapsed building 15 or 20 times in passing it on visits to his parents who resided on the Base Line Road one-half mile beyond the building; that he knew none of the parties to the law suit and did not realize that it involved the building he had seen until they commenced talking about ''Base Line Road'' (it is not shown whether this occurred in the opening statement of counsel or the testimony of the witnesses); that on visits to his parents he had heard the rumor that the building was struck by lightning; that he had never discussed the case with anybody and did not know there was such a case; that he had not formed or expressed any opinion as to the cause of the destruction of the building and could render a verdict based solely on the law and evidence; and that he did not know any of the people residing in the community except his parents and one of their neighbors.

Appellant also introduced Lewis B. Mize who lived in the community and had appeared as a witness for appellees. He testified that he had known Mr. Lyons 4 or 5 years and had patronized the juror's barber shop a few times more than a year before the trial. On these occasions he had work done by another barber there with whom he was acquainted and he had never ''discussed things'' with Lyons. Lyons was not asked whether he knew Mize but had stated that the only people he knew in the community were his parents and one of their neighbors.

The bill of exceptions does not contain the *voir dire* examination of the jurors nor the number of challenges exercised by either party, if any. The challenged juror did not sign the verdict, which was returned by only nine jurors. We have frequently held that it is within the trial court's discretion to set aside a verdict when

objection is made for the first time after rendition of the verdict. The same rule of discretion is applied as to the right of the court to discharge the jury or declare a mistrial during the trial. 50 C. J. S., "Juries," § 291. In *Fones Brothers Hdw. Co.* v. *Mears,* 182 Ark. 533, 32 S. W. 2d 313, this court upheld the action of the trial court in refusing to grant a new trial on account of the disqualification of a juror by reason of relationship to one of the parties where the bill of exceptions did not disclose that any questions were asked on the *voir dire* examination as to relationship of the juror to the parties, and it was not shown that diligence was used to ascertain such disqualification.

Appellant relies on the case of *D. F. Jones Construction Co.* v. *Fooks,* 199 Ark. 861, 136 S. W. 2d 487. It was there held that appellants were entitled to a new trial on the ground of newly discovered evidence where it was shown that two of the jurors, previous to the trial, were offered bribes to return a verdict for the appellee and had failed to disclose the offer when questioned on their *voir dire* as to whether or not they had been talked to by anyone relative to the case.

Since there is no record of the *voir dire* examination in the case at bar, we would have to indulge in speculation, which is not borne out by the facts subsequently developed, to say that Mr. Lyons was intentionally evasive and prompted by bad faith in answering questions touching his qualifications to serve as a juror. After the juror voluntarily disclosed the fact that he had seen the collapsed building, he made frank and straightforward answers to all questions. In viewing the cold record we find it insufficient to support the conclusion that he was actuated by improper motives and the trial judge was in much better position than this court to determine the juror's qualifications; he could observe the mannerism and hear the answers of the juror. In *Rumping* v. *Ark. National Bank,* 121 Ark. 202, 180 S. W. 749, the court said: "The decision of the trial judge upon the question of a juror's qualification must necessarily rest largely in the exercise of sound discretion, and the decision should not be set aside unless it clearly appears that

there has been an abuse of discretion and that a biased juror has been forced upon the parties.'' We cannot say that the trial court abused his discretion in refusing to declare a mistrial under the facts and circumstances presented here.

The judgment is affirmed.

HOLT, J., (dissenting). I respectfully dissent. I think the trial court committed reversible error when it refused appellant's request, made in apt time, for a mistrial when it was discovered that Juror Lyons, on his voir dire after the trial court had reviewed the issues which the pleadings presented and had interrogated this juror, as well as all others, whether he knew any of the facts and circumstances connected with the particular case and had answered in the negative, and in addition, after counsel for appellant and appellee had likewise questioned this juror and the others, and especially whether any of them had discussed the case, all answered in the negative when in fact Juror Lyons was familiar with many of the pertinent facts and had discussed the case with others. All the jurors were also asked whether they knew about what caused the destruction of the property involved or the parties to the litigation and a negative answer was given following the questions propounded.

The attorneys for the parties exercised the three peremptory challenges afforded them (§ 8346, Pope's Digest) and the jury was selected.

Near the close of the trial, it was discovered that Juror Lyons had actually viewed the building on many occasions subsequent to its collapse, was a friend of one the principal witnesses for appellees, had discussed the case with certain people in the community, had been informed that the building had been destroyed by lightning, and that his mother and father had for many years been neighbors of appellees, none of which, as indicated, he divulged upon his voir dire.

Upon appellant's request for a jury view of the building in question near the close of the testimony, the request was granted, and while the court was giving the

usual instructions to the jury to guide them while viewing the property, Juror Lyons arose from his seat in the jury box and asked of the court: "Do you have to go out there if you have already seen it?" He was then asked: "How frequently have you viewed this scene?" and he answered "Twenty-fifteen times."

Appellant argues that had he known these facts he would not have accepted Lyons as a juror.

Our jury system is hoary with age and is the best yet devised by man. Our Federal and State Constitutions guarantee to every person a fair and impartial trial before a jury of his peers.

In the circumstances, I do not think appellant has had that fair and impartial trial which was his right, in the present case.

"Full knowledge of all material and relevant matters is essential to a fair and just exercise of the right to challenge either for cause or peremptorily, and it is the duty of a juror to make full and truthful answers to such questions as are asked him, neither falsely stating any fact nor concealing any material matter. If he falsely misrepresents his interest or situation, or conceals a material fact relevant to the controversy, he is guilty of misconduct, and such misconduct is prejudicial to the party, for it impairs his right to challenge." 31 Am. Jur., § 108, p. 638.

The fact that Juror Lyons did not sign the verdict along with the nine who did sign it, it seems to me could make no difference. The fact remains that appellant was entitled to fair, frank and honest answers to the questions propounded before accepting him as a juror. It is undisputed that these answers he did not get. No one knows just what influence this juror exerted in the jury room or during his association with the jurors in this case. Whether his influence was exerted for or against appellant, we cannot know and we should not be required to speculate on this question. The record reflects that the trial court stated, when it refused to grant appellant's request for a mistrial, that it was an embarassing

situation due to his personal acquaintance with Juror Lyons.

While there was no intimation or accusation of fraud on the part of this juror, I think he was disqualified and a mistrial should have been declared.

In *D. F. Jones Construction Company, Inc.,* v. *Fooks,* 199 Ark. 861, 136 S. W. 2d 487, this court said: "The jury system is a great institution and should hold itself aloof from any and all corrupt influences. Members of juries owe it to themselves and to the great system to preserve the integrity of their verdicts. If there is substantial evidence in the case to support the verdict of the jury this court will not try a case de novo, but will accept and receive the verdict of the jury as final on issues involving not only property rights, but issues involving life and death. The only way to preserve the integrity of the verdicts of juries and keep the stream of justice pure is to set aside verdicts returned by juries which have been tampered with or attempted to be tampered with. * * *

"We think this is a most wise rule and adopt it as the rule in this state irrespective of whether such third persons are interested in the case or whether their attempts are sanctioned by the parties litigant or their attorneys. This court will not affirm a judgment on a verdict returned by a jury which has been tampered with or unduly influenced by parties litigant or by third persons. We regard this rule as necessary to inspire the confidence of the body politic in the jury system and in order to preserve the integrity of verdicts rendered by juries. The trial court should have sustained the second motion for a new trial and granted same."

"Verdicts returned by a jury where any member thereof had publicly expressed his opinion that the party charged was guilty of the crime and where this information was withheld from the court and the party charged with the crime by him at the time he qualified to sit upon the jury should not be upheld by the courts. Nothing can destroy the integrity of juries more effectively than to allow prejudiced jurors to sit in a case. The courts

should jealously preserve the integrity of juries." *Anderson* v. *State,* 200 Ark. 516, 139 S. W. 2d 396.

I think, therefore, that the judgment should be reversed and the cause remanded for a new trial.